**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND DIVISION**

| | |
|---|---|
| VAMPIRE LABS, LLC,<br><br>               Plaintiff,<br><br>       v.<br><br>ADVANCED MICRO DEVICES, INC.,<br><br>           Defendant. | Civil Action No. 1:25-cv-1838<br><br>**JURY TRIAL DEMANDED** |

<u>**ORIGINAL COMPLAINT**</u>

Plaintiff Vampire Labs, LLC ("Vampire Labs" or "Plaintiff") hereby files its Original Complaint against Defendant Advanced Micro Devices, Inc. ("Defendant" or "AMD"), alleging infringement of United States Patent Nos. 9,098,271; 9,104,476; and 9,218,048 (the "Patents-in-Suit") as follows:

**I.      NATURE OF THE ACTION**

1.      This is a civil action for infringement of the Patents-in-Suit under the patent laws of the United States, 35 U.S.C. § 100, *et seq.*

**II.      THE PARTIES**

2.      Plaintiff Vampire Labs is a company organized and existing under the laws of Texas. It was founded in Austin, Texas with its principal place of business in Austin.

3.      Defendant AMD is a corporation duly organized and existing under the laws of the State of Delaware, having regular and established places of business in the Western District of Texas, including at 7171 Southwest Parkway, Austin, Texas 78735; 7000 West William Cannon Drive, Austin, Texas 78735; and 1340 Airport Commerce Drive, Austin, Texas 78741.

4.      AMD may be served through its registered agent CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

### III.    JURISDICTION AND VENUE

5.    Vampire Labs asserts claims for patent infringement arising under the patent laws of the United States, 35 U.S.C. § 100, *et seq.*  This Court has subject matter jurisdiction of these claims under, *inter alia*, 28 U.S.C. §§ 1331 and 1338(a).

6.    AMD is subject to this Court's specific and general personal jurisdiction consistent with the principles of due process and/or the Texas Long Arm Statute, TEX. CIV. PRAC. & REM. CODE § 17.041 *et seq*.  This Court has general and specific personal jurisdiction over AMD at least because AMD has committed acts within the State of Texas and the Western District of Texas giving rise to this action, including, on information and belief, developing, making, using, marketing, selling, offering for sale, importing into the United States, and/or testing the infringing products, transacting and conducting business in the State of Texas and in the Western District of Texas, and transacting and conducting business with residents of the State of Texas and of the Western District of Texas.

7.    Vampire Labs's causes of action arise, at least in part, from AMD's contacts with and activities in and/or directed at this District and the State of Texas. AMD has systematic and continuous business activities in this District. As described below, AMD has committed acts of patent infringement giving rise to this action within this District.

8.    Personal jurisdiction exists generally over AMD because AMD has sufficient minimum contacts with the forum as a result of business conducted within the State of Texas and the Western District of Texas and/or has engaged in continuous and systematic activities in the Western District of Texas, and AMD is registered with the Secretary of State to do business in the State of Texas. Personal jurisdiction also exists over AMD because it makes, uses, sells, offers for sale, imports, advertises, makes available, and/or markets products or processes within the State of Texas and the Western District of Texas that infringe one or more claims of the Patents-in-Suit, as alleged more particularly below.

9.      For example, as alleged more particularly below, AMD has infringed and continues to infringe the Patents-in-Suit within the State of Texas and the Western District of Texas by making, using, selling, licensing, offering for sale, and/or importing or exporting in, into, or out of the Western District of Texas and elsewhere in the State of Texas, products and services covered by claims in the Patents-in-Suit, including without limitation products that, when made or used, practice the claimed methods and systems of the Patents-in-Suit.  AMD, directly and through intermediaries, makes, uses, sells, offers for sale, imports, ships, distributes, advertises, promotes, and/or otherwise commercializes such infringing products and services in or into the Western District of Texas and the State of Texas.  AMD regularly conducts and solicits business in, engages in other persistent courses of conduct in, and/or derives substantial revenue from goods and services provided to residents of the Western District of Texas and the State of Texas.

10.     Venue in this District is proper under 28 U.S.C. §§ 1400(b) and 1391(b)-(d) because AMD maintains a regular and established place of business in this district and has committed acts of infringement within this judicial district giving rise to this action. AMD makes, uses, sells, and/or offers to sell infringing products or processes within the Western District of Texas, has a continuing presence within the Western District of Texas, and has the requisite minimum contacts with the Western District of Texas such that this venue is a fair and reasonable one. Upon information and belief, AMD has transacted, and at the time of the filing of this Complaint, is continuing to transact business within the Western District of Texas.

11.     AMD has regular and established places of business in the Western District of Texas, including at their 870,000 square foot, 58-acre Austin campus located at 7171 Southwest Parkway, Austin, TX 78735; at 7000 West William Cannon Drive, Austin, TX 78735; at 1340 Airport Commerce Drive, Austin, TX 78741; and at 12301 Research Boulevard, Suite 300, Austin TX

78759.[1] As of December 2023, AMD had more than 3,500 employees in Austin.[2] As of September 2025, AMD has over 200 job postings for Austin.[3]

12.     On information and belief, AMD uses, sells, tests, offers to sell, and/or imports infringing products into and/or within the Western District of Texas, including at its Austin locations. AMD maintains a permanent and/or continuing presence within the Western District of Texas at its Austin locations, and has the requisite minimum contacts with the Western District of Texas such that this venue is a fair and reasonable one. Upon information and belief, AMD has transacted and, at the time of the filing of this Complaint, is continuing to transact business within the Western District of Texas.

13.     AMD purposefully directs or controls the sale of the Accused Products,[4] including, on information and belief, for sale in Texas and elsewhere in the United States, and expects and intends that the Accused Products will be so sold in the Western District of Texas. AMD purposefully places the Accused Products—whether by themselves or through subsidiaries, affiliates, or third parties—into a supply chain, knowing that the Accused Products will be sold in Texas and in the Western District of Texas. Therefore, AMD also facilitates the sale of the Accused Products in Texas and in this district.  On information and belief, AMD is aware that Texas generally and this district in particular are termination points for distribution of the Accused Products through AMD's established distribution channels.

14.     On information and belief, current and former AMD employees with knowledge relevant to the claims in this case are located in the Western District of Texas and within the State of

---

[1] https://www.amd.com/en/corporate/locations.html
[2] https://www.statesman.com/story/business/real-estate/2023/12/04/amd-semiconductor-lease-extension-austin-texas-vital-hub/71742105007/
[3] https://careers.amd.com/careers-home/jobs?stretchUnits=MILES&stretch=50&location=Austin,%20TX&lat=30.26715&lng=-97.74306&woe=7
[4] "Accused Products" are defined in paragraphs 44 *et seq*., below.

Texas. For example, searches of LinkedIn® reveal over 2,000 individuals located in Texas and approximately 1,700 located in Austin or the Austin metropolitan area who list AMD Corporation as their current employer. Among those are the CEO Lisa Su, CTO Mark Papermaster, Chief IP Officer Kim Vo, and CFO Jean Hu.

15.    For at least the above reasons, venue is proper and convenient in the Western District of Texas.  Vampire Labs reserves the right to amend or supplement its initial contentions regarding jurisdiction and venue as set forth herein, based upon further discovery.

## IV.    FACTUAL BACKGROUND

### A.    Vampire Labs

16.    Vampire Labs was founded in Austin, Texas to advance low-power and energy-conservation technologies for electronic devices and circuits. Among other innovations, the company holds patents for technology that mitigates static power dissipation in microprocessor cores and accelerators using fine-grained power-gating techniques.

### B.    Patents-in-Suit

17.    Vampire Labs is the owner and assignee of all right, title, and interest in and to United States Patent No. 9,098,271, entitled "Autonomous microprocessor re-configurability via power gating pipelined execution units using static profiling" (the "'271  patent"), is a valid, enforceable patent that the United States Patent and Trademark Office duly and lawfully issued on August 4, 2015, in full compliance with Title 35 of the United States Code. A true and correct copy of the '271 patent is attached hereto as Exhibit A. Vampire Labs has ownership of all substantial rights to the '271 patent, including the right to exclude others and to enforce, sue, and recover damages for past, present and future infringements thereof.

18.    The claims of the '271 patent, particularly when viewed as a whole, including as an ordered combination, address technological subject matter; solve technical problems; and are

directed to patent-eligible subject matter. They are not merely the recitation of well-understood, routine, or conventional technologies or components at the time of invention.

19.    Vampire Labs is the owner and assignee of all right, title, and interest in and to United States Patent No. 9,104,416, entitled "Autonomous microprocessor re-configurability via power gating pipelined execution units using dynamic profiling" (the "'416 patent"), is a valid, enforceable patent that the United States Patent and Trademark Office duly and lawfully issued on August 11, 2015, in full compliance with Title 35 of the United States Code. A true and correct copy of the '416 patent is attached hereto as Exhibit B. Vampire Labs has ownership of all substantial rights to the '416 patent, including the right to exclude others and to enforce, sue, and recover damages for past, present, and future infringements thereof.

20.    The claims of the '416 patent, particularly when viewed as a whole, including as an ordered combination, address technological subject matter; solve technical problems; and are directed to patent-eligible subject matter. They are not merely the recitation of well-understood, routine, or conventional technologies or components at the time of invention.

21.    Vampire Labs is the owner and assignee of all right, title, and interest in and to United States Patent No. 9,218,048, entitled "Individually activating or deactivating functional units in a processor system based on decoded instruction to achieve power saving" (the "'048 patent"), is a valid, enforceable patent that the United States Patent and Trademark Office duly and lawfully issued on December 22, 2015, in full compliance with Title 35 of the United States Code. A true and correct copy of the '048 patent is attached hereto as Exhibit C. Vampire Labs has ownership of all substantial rights to the '048 patent, including the right to exclude others and to enforce, sue, and recover damages for past, present, and future infringements thereof.

22.    The claims of the '048 patent, particularly when viewed as a whole, including as an ordered combination, address technological subject matter; solve technical problems; and are

directed to patent-eligible subject matter. They are not merely the recitation of well-understood, routine, or conventional technologies or components at the time of invention.

23.    Together, the '271 patent, the '416 patent and the '048 patent are referred to herein as the "Patents-in-Suit."

24.    To the extent required and applicable, Vampire Labs has complied with the marking requirements of 35 U.S.C. § 287(a) for all Patents-in-Suit and therefore is entitled to past damages.

**C.    Technical Background**

25.    One of the most important design and operational considerations in developing semiconductors and microprocessors is the management of power to ensure that the heat associated with it is properly controlled and removed to avoid damage to the delicate circuitry.

26.    As such, the design and manufacture of semiconductor products must carefully control the amount of power drawn by the devices to ensure proper functioning and to protect the devices against damage and malfunction.

27.    There are two types of semiconductor power that must be accounted for: dynamic and static.

28.    Dynamic power is used during active switching of transistors during operation. It has a quadratic relationship with voltage, meaning that a linear percentage decrease in the voltage supply produces a much larger percentage decrease in dynamic power. As transistor size has decreased over time, less operating voltage is required, which entails an even greater decrease in the amount of dynamic power dissipation. Put differently, dynamic power consumption typically improves from process node to node because smaller transistor sizes require less input voltage to function.

29.    Static, or "leakage," power, on the other hand, is power dissipated when transistors are not actively switching. In contrast to dynamic power, which is tied to charging and discharging capacitances during transitions, static power is continuously present because of various leakage mechanisms inherent to transistor physics and device architecture. These leakage mechanisms

include "gate oxide leakage," where electrons are able to tunnel through the thin dielectric layer of a gate. "Subthreshold leakage" occurs when the transistor is switched off but still carries a current between source to drain when the gate voltage is below the voltage threshold. Other leakage mechanisms include "junction leakage," "band-to-band tunneling leakage," "hot carrier injection leakage." The sum of all these leakage currents define the total static power dissipation of a semiconductor chip or circuit region.

30.    In contrast to dynamic power, the problem of static power becomes worse as the size of transistors and other semiconductor elements shrink over time. The transistors in modern semiconductors have become so small that static power leakage is now becoming the dominant form of power loss.

31.    The problem is further exacerbated by the fact that modern devices force more transistors into the same physical dimensions, which means that effects of all of the individual current leakages multiply because there are many more of them in a given physical space. One result of this phenomenon is that, as transistor sizes shrink, the percentage of transistors that are *usable* trends downward. In turn, this deprives users of some of the benefits of smaller form factors as the increased transistor density cannot be fully leveraged. To illustrate, an older process node might be able to place one million transistors in a given physical space, while a newer node could place two million transistors in the same space. But if a large percentage of those transistors cannot be used due to the effects of static power leakage, the density advantage of the newer node process is reduced.

32.    Traditional techniques for reducing dynamic power dissipation include clock gating, and dynamic voltage and frequency scaling (DVFS). On the other hand, techniques for reducing static power dissipation have included coarse-grained power gating.[5]

---

[5] The distinction between coarse- and fine-grained power gating can be obscured in promotional materials, which do not always properly characterize the level and degree of power gating.

33.     Clock gating is a popular approach to reduce dynamic power dissipation. In this technique, logic is added to disable or "gate" the clock input to portions of the circuitry that do not require clock stimulus for a given process. But the relevant circuit block is still supplied with voltage and therefore still suffers from static power leakage.

34.     Another technique to reduce dynamic power dissipation is "dynamic voltage-frequency scaling," which reduces the voltage and frequency of a processor core during low utilization periods, thus reducing the power that may be used in that time. Again, the relevant circuit block is still supplied with voltage and therefore still incurs static power loss.

35.     With coarse-grained power gating, the power gating is typically initiated through predictive mechanisms that predict whether a particular large block of circuitry is not needed, and then disables that circuit block to reduce static power. Though terminology is not always consistently applied, this type of power gating is "coarse" in the sense that it performs the gating function at the level of large blocks of circuitry, typically entire processor cores, blocks, or peripheral logic.

36.     Coarse-grained power gating carries a number of drawbacks. First, a processor's determination about which cores or circuity blocks can be turned off are typically made through prediction-based techniques. This is not ideal because predictions can be wrong, causing latency (delay in powering up and responsiveness) and other problems. This technique is also inflexible because it only applies at the level of large blocks of circuitry and typically disables them for large blocks of time—missing opportunities to save power in portions of "active" blocks that are not needed for a particular process but are still consuming and leaking power.

37.     During the time period when the Patents-in-Suit were conceived and reduced to practice, including by filing the patent applications that lead to the issuance of the Patents-in-Suit, there was a need for technical solutions to the problem of static leakage power dissipation in semiconductor devices. That need would grow dramatically going forward with transistor sizes

continuing to shrink; and it was addressed by the inventions disclosed and ultimately patented in the Patents-in-Suit.

38.    Those patented solutions have been used—and continue to be used—by AMD across a broad range of its semiconductor products.

**D.    Eastlack Invents Novel Techniques for Fine-Grained Power Gating and Applies for Patents on Them**

39.    The sole inventor of the Patents-in-Suit is Jeffrey Eastlack, who earned both his undergraduate and graduate engineering degrees at New Mexico State University in Las Cruces, NM.

40.    Eastlack moved to Austin, Texas, and began his career in the early 2000s, working for technology companies that include IBM, Freescale, and Altera. He co-founded Vampire Labs in 2008, and his innovations for fine-grained power-gating originated from research ideas while pursuing his master's degree in electrical engineering.

**E.    AMD Incorporates the Patented Technology Into Its Product Lines**

41.    On information and belief, AMD began implementing thread-level, fine-grained power gating at least in connection with its commercial deployment of GCN 4.0 (codenamed Baffin) in 2016.

42.    Per AMD, power gating was effectuated through PowerPlay. PowerPlay is the brand name for a set of technologies for the reduction of the energy consumption implemented at least in several of AMD's graphics processing units. PowerPlay is supported by AMD's proprietary graphics device driver, "Catalyst," which has accordingly been modified over time to support AMD's implementation of power-gating associated functionality.

```
402    /* This function is for Baffin only for now,
403     * Powerplay will only control the static per CU Power Gating.
404     * Dynamic per CU Power Gating will be done in gfx.
405     */
```

**Fig. A-1** (available at https://gitlab.nic.cz/turris/linux/-/blob/7df48927b2b804c08022a05ded545b073ba00da7/drivers/gpu/drm/amd/powerplay/hwmgr/ellesmere_clockpowergating.c).

43.    AMD's Baffin architecture is used in a number of AMD products lines, for example: https://www.techpowerup.com/gpu-specs/amd-baffin.



**Figs. A-2 and A-3**; *see also* AMD's U.S. Patent Application US2018/0121386A1 (J. Chen *et. al.*).

44.    On information and belief, AMD now broadly applies fine-grained power gating in its CPU, GPU, and other processor offerings. As such, the Accused Products are: AMD's product lines at least within its Zen 3+ and later CPU architectures; the corresponding server/data center CPU architectures; its Baffin and later consumer/gaming GPU architectures; and the corresponding data center/computer GPU architectures, along with all other products that are reasonably similar in the context of one or more claims of the Patents-in-Suit.

### COUNT I — INFRINGEMENT OF U.S. PATENT NO. 9,218,048

45.    Vampire Labs incorporates by reference the foregoing paragraphs as if fully set forth herein.

46.    AMD, without authorization or license, has been and is presently directly infringing, and unless enjoined will continue to directly infringe at least claim 1 of the '048 Patent in violation of 35 U.S.C. § 271(a). AMD's acts of infringement include making, using (including for testing and development purposes), selling and offering to sell within the United States, supplying or causing to

be supplied in or from the United States, and importing into the United States, the Accused Products, which include the claimed functional unit control system.[6] Defendant AMD is thus liable for direct infringement of the '048 Patent.

47.    The '048 Accused Products include one or more functional unit control systems that utilize instruction decoders, power control units, functional units (such as branch units, integer units, and floating point mathematical units), and switches to perform thread-level fine-grained power gating to mitigate static power loss in functional units that are not needed for a given process. To the extent any element or limitation is determined not literally present, Vampire Labs asserts infringement under the doctrine of equivalents.

48.    An illustrative product architecture is the Zen 3+ architecture (a/k/a "Rembrandt") adopted by AMD.  Within that architecture, the AMD Ryzen™ 6000 series of mobile processors is a representative product line.

49.    AMD's Ryzen 6000 series processors within the Zen 3+ architecture illustrate AMD's infringement of claim 1 of the '048 Patent:

**Claim 1: A functional unit control system comprising: [a] an instruction decoder of a processor, the instruction decoder being configured to decode an instruction to be performed by the processor;**

50.    Instruction decoders are foundational elements for computer processors. They translate binary machine code into control signals that tell the processor's internal components what to do.

51.    The Accused Products each include one or more instruction decoders that decode instructions for the processor core(s), and such decoders inherently function to decode instructions to be performed by a processor. For example:

---

[6] The claims of the '048 Patent set forth the invention precisely. Any shorthand used to describe the patented or infringing technologies is merely for convenience and does not supplant or replace the claim language itself.



**Fig. 048-2** (available at https://ieeexplore.ieee.org/abstract/document/9567108, p. 5).



**Fig. 048-3** (available at https://ieeexplore.ieee.org/document/9895632, p.7).

**Claim 1[b]: a power controller unit coupled to the instruction decoder; and**

52.    Power controllers are also foundational building blocks, and they are coupled (directly or indirectly) to the decoder and other elements in the microprocessor. At least one type of such power controllers is called a System Management Unit (SMU):

> AMD has long used a System Management Unit (SMU) to control voltages based on sensory data, but the SoC included only a single SMU. With Rembrandt, AMD has added remote SMUs, which are smaller SMUs spread around the various chip elements that can control clock gating and power gating autonomously, and thus faster, based on budgets assigned by the central SMU.

**Fig. 048-4** (available at https://www.tomshardware.com/news/amd-6nm-ryzen-6000-rembrandt-soc-deep-dive-gunning-for-alder-lake).

53.    The SMUs control power within and among the processor cores and are coupled to one or more instruction decoders. AMD touts that the Zen 3+ architecture communicates "per-thread" utilization to the OS:



**Fig. 048-5** (available at https://ieeexplore.ieee.org/document/9895632, p.4); *see also* **Fig. 3.**

**Claim 1[c]: a first functional unit of the processor coupled to the power controller unit and the instruction decoder;**

54.    The Zen 3+ architecture includes many functional units for executing decoded computer instructions in execution threads. These include, but are not limited to, Integer and Floating Point Units:



**Fig. 048-6** (available at https://ieeexplore.ieee.org/abstract/document/9567108, p. 5).

**Claim 1[d]: a plurality of switches, the power controller unit and the first functional unit being coupled together via the switches configurable to improve the power up latency to the functional unit via accelerating in-rush current;**

55.    AMD's power gating uses switches to toggle power on and off. The Zen 3+ architecture implements fine-grained power-gating, and as such it includes switches that are coupled to the power controller unit (which controls the signaling that turns particular functional units on or off as needed) and to the functional units themselves, which are the things that are turned on and off.



**Fig. 048-7** (available at https://ieeexplore.ieee.org/document/9895632, p.12); *see also* **Fig. 3**. Zen 3+ implements the power-gating circuitry to reduce the amount of time it takes for power-gated regions to enter and wake-up from sleep, i.e., it improves power-up latency.

> Rembrandt's SoC redesign features rearchitected power domains and a more efficient control plane for those domains (including hardware-assisted transitions in and out of sleep). Here we can see that AMD carved the chip up into six power domains instead of the previous-gen's three power planes. This allows tighter power-gating, thus providing more granularity for the internal and external power rails to improve power efficiency and reduce the time it takes for the various regions to enter and resume from sleep. This also allows each region to operate within its optimal point on the voltage/frequency curve.

**Fig. 048-8** (available at https://www.tomshardware.com/news/amd-6nm-ryzen-6000-rembrandt-soc-deep-dive-gunning-for-alder-lake); *see also* https://dvcon-proceedings.org/wp-content/uploads/low-power-verification-at-gate-level-for-zen-microprocessor-core-1.pdf ).

> AMD also gave more detailed information about the power consumption control at the SoC level . It mainly includes: first, independent power partition control for CPU , GPU , display, USB , bus and other parts; second, new hardware-assisted accelerators for faster switching of components' sleep and wake-up states; third, improved clock gating and power gating. AMD has improved the physical clock and power gating functions of the new processor, and is applicable to all modules and units; fourth, a new memory control mechanism, adding new RAM shutdown control, and a new bypass mode that allows RAM to directly use non-standard voltages to achieve energy saving functions, and can also control different memory channels, memory sockets and memory blocks; finally, a new EDC controller that enhances the electrical design constraint control of the processor to achieve more granular control of the SoC . Combining the previous content and the subsequent new content, AMD basically has comprehensive and fine-grained control over the entire SoC , which means that AMD is already very mature in power consumption control of mobile processors.

**Fig. 048-9** (available at http://www.mcplive.cn/?controller=article&id=16261) (Translated); *see also* Low-Power Verification at Gate Level for Zen Microprocessor Core, available at: https://dvcon-proceedings.org/wp-content/uploads/low-power-verification-at-gate-level-for-zen-microprocessor-core-1.pdf).

> From AMD 's functional description, since Zen 3+ is aimed at the mobile processor market, most of its functional improvements are designed for instant response when mobile devices enter dormancy or sleep state, such as energy saving or fast wake-up. Generally speaking, it is difficult for a large processor with 8 CPU cores such as AMD Ryzen 7 6800HS to achieve full load of the entire CPU at the same time . There are always some modules, cores, or even almost all processors in idle state. Therefore, it is very important to correctly judge which components are idle and command them to sleep quickly to save energy, and also to wake up quickly from sleep state to improve response speed. It is worth noting that constantly switching the working state of the core itself consumes energy, which involves AMD 's intelligent control solution for the processor, which is also a great test of SoC design capabilities.

**Fig. 048-10** (available at http://www.mcplive.cn/?controller=article&id=16261) (Translated)

**Claim 1[e]: wherein the power controller unit is configured to determine whether the first functional unit should be used to perform at least part of the instruction based on data of the instruction decoder;** [and]

**Claim 1[f]: wherein the power controller unit is further configured to perform at least one of activating and deactivating the functional unit in accordance with the determination of whether the functional unit should be used, and the functional unit is powered on for the minimal number of clock cycles needed to execute the instruction; and**

56.    In the Zen 3+ architecture, the SMU activates and deactivates functional units of the processor core based on decoded instructions within execution threads. If an execution thread needs a partiuclar functional unit, it can be powered on, and if not, the functional unit can be powered off, in either case the determination is made based on the decoded instruction stream or thread.

> The first aspect is the new 6nm process mentioned in the previous article. AMD can provide the highest possible performance per watt and per square millimeter through the improvement of the new process. The second aspect is the improvement of the architecture. AMD has provided more than 50 energy-related improvements for the Zen 3+ architecture. AMD has provided a summary directory as follows:
>
> 1.   Per-Thread Power/Clock Control : Further refine the granularity of power consumption control within the CPU . and now it can be controlled for each thread instead of the traditional each core. The reason for this is that when a thread runs within the core, it may not need to wake up all parts of the core, which can accurately allocate energy to those parts that need to be operated to a large extent, while the rest of the parts remain in a low power state.
> 2.   Leakage control ( LEAKAGE ): The design end and the process end work together to control leakage to achieve better performance.

**Fig. 048-11** (available at http://www.mcplive.cn/?controller=article&id=16261) (Translated).

**Claim 1[g]: wherein the first functional unit is prevented from incurring static power loss and dynamic power loss when deactivated.**

57.     When execution units are power gated, the power to those units is turned off for a period of time until needed again. Without power, these execution units do not incur static power loss, which only occurs when a circuit or transistor is connected to power.

58.     **Indirect Infringement.** In addition, AMD, without authorization or license from Vampire Labs, is indirectly infringing at least claim 1 of the '048 Patent, including actively inducing infringement of the '048 Patent under 35 U.S.C. § 271(b).  Such inducements include without limitation, with specific intent to encourage the infringement, knowingly inducing consumers to use infringing articles and methods that AMD knows or should know infringe one or more claims of the '048 Patent.  AMD instructs its customers to make and use the patented inventions of the '048 Patent by operating AMD's products in accordance with AMD's design and specifications.  AMD specifically intends its customers to infringe by implementing the infringing thread-level fine-grained power gating.

59.     In addition, AMD, without authorization or license from Vampire Labs, is indirectly infringing at least claim 1 of the '048 Patent by contributing to its infringement under 35 U.S.C. § 271(c) and/or §271(f), either literally and/or under the doctrine of equivalents. AMD's contributory infringement includes without limitation, AMD's sales and offers to sell a component of a product or apparatus for use in a process, that (i) is material to practicing the invention claimed by claim 1 of the '048 Patent; (ii) is not a staple article or commodity of commerce suitable for substantial non-infringing use; and (iii) AMD is aware or knows to be especially made or especially adapted for use in infringement of the '048 Patent. AMD specifically intends its customers to infringe by implementing fine grained power gating in an infringing manner, as set forth above and in the excerpts from Defendants' technical manuals, source code, controllers, switches, firmware and compilers.

60.     As a result of AMD's infringement of the '048 Patent, Vampire Labs has suffered damages, and is entitled to an award of damages adequate to compensate it for such infringement under 35 U.S.C. § 284, but in no event less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

### COUNT II — INFRINGEMENT OF U.S. PATENT NO. 9,104,416

61.     Vampire Labs incorporates by reference the foregoing paragraphs as if fully set forth herein.

62.     AMD, without authorization or license, has been and is presently directly infringing, and unless enjoined will continue to directly infringe at least claim 1 of the '416 Patent in violation of 35 U.S.C. § 271(a). AMD's acts of infringement include making, using (including for testing and development purposes), selling and offering to sell within the United States, supplying or causing to be supplied in or from the United States, and importing into the United States, the Accused Products, which include the claimed functional unit control system and practice the claimed functional unit control methods.[7] Defendant AMD is thus liable for direct infringement of the '416 Patent.

63.     The '416 Accused Products practice one or more functional unit control methods and include one or more functional unit control systems that utilize performance monitoring units, performance data, functional units, configuration registers, switches, look-up tables, and specific needs values to perform the claimed methods and/or to make, use, sell, offer to sell and/or import the claimed system for controlling at least one functional unit. To the extent any element or limitation is determined not literally present, Vampire Labs asserts infringement under the doctrine of equivalents.

---

[7] The claims of the '416 Patent set forth the invention precisely. Any shorthand used to describe the patented or infringing technologies is merely for convenience and does not supplant or replace the claim language itself.

64.    An illustrative product architecture is the RDNA architecture adopted by AMD, which demonstrates AMD's infringement of at least claim 1 of the '416 Patent:

**Claim 1: A functional unit control method comprising: [a] using a performance monitoring unit connected to a processor, collecting performance data of a first type of functional unit in an execution stage of the processor's pipeline;**

65.    On information and belief, AMD's RDNA processors incorporate a performance monitoring unit that collects performance data during execution. While not necessarily used during operation, AMD's ROCProfiler demonstrates some specific capabilities of the RDNA processors' ability to collect specific performance information from a first type of functional unit during execution of the processing pipeline.

---

**Profile Type**

The profile type defines the type of profile data collected and how the data should be collected. The following profile types are supported:

- CPU Profile
- GPU Profile
- GPU Trace
- System-wide Power Profile
- Energy Analysis (Windows only)

---

**Fig. 416-1** (available at https://www.amd.com/content/dam/amd/en/documents/developer/version-4-0/uprof-4.0-documentation.zip Page- 26).

66.    In 2016, AMD released a research paper describing the benefits of "fine-grained GPU data power management." *See* https://www.cse.psu.edu/hpcl/docs/2016_PACT_Onur.pdf (the "µC States" paper).

67.    In the µC States paper, AMD writes: "µC-States Gating Algorithm. In order to dynamically tune the pipeline components, each core requires a Gating Control Unit. As shown in Figure 8, the controller periodically decides whether or not a group of components should be tuned-down." *Id*. at 7.

**Claim 1[b]: determining a utilization level of the first type of functional unit based on the performance data;**

68.     The RDNA architecture determines a utilization level of the first type of functional unit based on performance data. The performance counters quantify the performance of the underlying architecture, showcasing (determining) the utilization of various pieces of the computational pipeline and memory hierarchy, which includes functional units, based on the "counted" performance.



**Fig. 416-2** (available at https://rocm.docs.amd.com/projects/rocprofiler/en/latest/how-to/using-rocprof.html).

> ## ROC-profiler
>
> The ROC-profiler primarily serves as the low level API for accessing and extracting GPU hardware performance metrics, also typically called performance counters. These counters quantify the performance of the underlying architecture showcasing which pieces of the computational pipeline and memory hierarchy are being utilized. A script/executable command called `rocprof` is packaged with the ROCm™ installation and provides the functionality for listing all available hardware counters for your specific GPU as well as running applications and collecting counters during the execution.

**Fig. 416-3** (available at: https://rocm.blogs.amd.com/software-tools-optimization/profilers/README.html).

> • Performance counter collection: This feature collects performance counters for each API call and kernel execution.

**Fig. 416-4** (available at: https://rocm.docs.amd.com/projects/rocprofiler/en/latest/what-is-rocprofiler.html).

**Claim 1[c]: comparing the utilization level of the first type of functional unit with a first threshold;**

69.     The RDNA Architecture compares the utilization level of the first type of functional unit with a first threshold.

70.    As discussed above, it can be optimized using, for example, the ROCProfiler's ability to extract performance counters. Such optimization necessarily entials comparing the extracted performance counters to a threshhold of some type. *See* **Figs. 416-3** and **416-4**.

71.    During operation, on information and belief, AMD gathers similar information to perform fine-grained power gating at the functional unit level.

**Claim 1[d]: when a first condition has been satisfied, power gating at least one of the first type of functional unit in the processor;**

72.    The RDNA Architecture enables power-gating at a fine-grained level, which necessarily entails toggling power on-and-off when defined conditions are met.

> The GPU is on a separate power plane from the CPUs which allows its voltage and frequency to be independently controlled. Table 1 shows the DVFS states for the GPU in the AMD A10-5800K APU; we will refer to these states throughout the rest of this paper [15]. Although all CUs in a GPU share the same voltage plane, individual GPU CUs can be power gated through software accessible registers.
> The current state-of-the-art in GPU power management is the application of DVFS. In this paper we also consider scaling the *number of active GPU CUs* via power gating. We analyze the value of scaling *both* frequency and the number of active CUs in a GPU. Our power management goal is to maximize performance subject to the power cap using both management techniques. Finally, we refer to a *power configuration* as the combination of a DVFS state and the number of active CUs in the GPU. There are six SIMD CUs and three GPU frequencies in the AMD A-series APUs resulting in a total of 18 power configurations.

**Fig. 416-5** (available at: http://computermachines.org/joe/publications/pdfs/asbd2014_power.pdf).



**Fig. 416-6** (available at: https://github.com/ROCm/ROC-smi/issues/5).

**Claim 1[e]: updating a configuration register that controls a switch governing power provided to the first functional unit;**

73.     In the power gating process, the RDNA Architecture updates a configuration register (temporary directory/register) that controls a switch governing power provided to the first functional unit. *See* **Fig. 416-2, 416-3** and **416-5**.

**Claim 1[f]: updating a lookup-table disposed in at least one of off-chip and on-chip memory, wherein the configuration register is updated using information from the lookup-table during the context switch to limit a startup time required to profile a current process running on the processor; and,**

74.     In the power gating process, the RDNA Architecture updates a lookup-table disposed in at least one of off-chip and on-chip memory (dynamic profiling is performed for multiple processes and the register is updated in memory), wherein the configuration register (control register) is updated using information from the look-up table during the context switch to limit a startup time required to profile a current process running on the processor. *See* **Fig. 416-2 – 416-6**.

**Claim 1[g]: wherein the lookup-table stores specific needs values for a plurality of processes after each has been profiled to permit reuse of the specific needs values for corresponding processes during each context switch of the processor.**

75.    The RDNA Architecures employs a lookup-table wherein the lookup-table stores specific needs values for a plurality of processes to permit reuse of the specific needs values for corresponding processes during each context switch of the processor (dynamic profiling and the information file stored in the memory). *See* **Figs. Fig. 416-2 – 416-6**.

76.    For example, AMD uses an SIMD mask for profiling for analogous purposes:

```
* Set SIMD Mask (GFX9) or SIMD ID for collection (Navi)
*/
HSA_VEN_AMD_AQLPROFILE_PARAMETER_NAME_SIMD_SELECTION = 8,
/*
* Set true for occupancy collection only.
*/
```

**Fig.   416-7**   (available   at   https://www.math.cmu.edu/users/aullrich/myenv/lib/python3.8/site-packages/triton/backends/amd/include/hsa/hsa_ven_amd_aqlprofile.h).

77.    **Indirect Infringement.** In addition, AMD, without authorization or license from Vampire Labs, is indirectly infringing at least claim 1 of the '416 Patent, including actively inducing infringement of the '416 Patent under 35 U.S.C. § 271(b).  Such inducements include without limitation, with specific intent to encourage the infringement, knowingly inducing consumers to use infringing articles and methods that AMD knows or should know infringe one or more claims of the '416 Patent.  AMD instructs its customers to make and use the patented inventions of the '416 Patent by operating AMD's products in accordance with AMD's design and specifications.  AMD specifically intends its customers to infringe by implementing the infringing thread-level fine-grained power gating.

78.    In addition, AMD, without authorization or license from Vampire Labs, is indirectly infringing at least claim 1 of the '416 Patent by contributing to its infringement under 35 U.S.C. § 271(c) and/or §271(f), either literally and/or under the doctrine of equivalents. AMD's contributory infringement includes without limitation, AMD's sales and offers to sell a component of a product

or apparatus for use in a process, that (i) is material to practicing the invention claimed by claim 1 of the '416 Patent; (ii) is not a staple article or commodity of commerce suitable for substantial non-infringing use; and (iii) AMD is aware or knows to be especially made or especially adapted for use in infringement of the '416 Patent. AMD specifically intends its customers to infringe by implementing fine grained power gating in an infringing manner, as set forth above and in the excerpts from Defendants' technical manuals, source code, controllers, switches, firmware and compilers.

79.    As a result of AMD's infringement of the '416 Patent, Vampire Labs has suffered damages, and is entitled to an award of damages adequate to compensate it for such infringement under 35 U.S.C. § 284, but in no event less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## COUNT III — INFRINGEMENT OF U.S. PATENT NO. 9,098,271

80.    Vampire Labs incorporates by reference the foregoing paragraphs as if fully set forth herein.

81.    AMD, without authorization or license, has been and is presently directly infringing, and unless enjoined will continue to directly infringe at least claim 1 of the '271 Patent in violation of 35 U.S.C. § 271(a). AMD's acts of infringement include making, using (including for testing and development purposes), selling and offering to sell within the United States, supplying or causing to be supplied in or from the United States, and importing into the United States, the Accused Products, which include the claimed computer-readable media, the claimed system for controlling a functional unit, and practice the claimed method of controlling a functional unit.[8] Defendant AMD is thus liable for direct infringement of the '271 Patent.

---

[8] The claims of the '271 Patent set forth the invention precisely. Any shorthand used to describe the patented or infringing technologies is merely for convenience and does not supplant or replace the claim language itself.

82.     The '271 Accused Products practice one or more methods of controlling a functional unit and include one or more computer-readable media, and/or system for controlling a functional unit that utilize static code profilers, developer processors, target processors, specific needs profiles, functional units, configuration registers, look-up tables, determinations about whether particular functional unit types will be used to perform a given process, and context switches to perform the claimed methods and/or to make, use, sell, offer to sell and import the claimed computer-readable media and system for controlling a functional unit. To the extent any element or limitation is determined not literally present, Vampire Labs asserts infringement under the doctrine of equivalents.

83.     An illustrative product architecture is the Radeon RDNA architecture adopted by AMD, and exemplary performance monitoring units include AMD's ROCProfiler and Radeon GPU Profiler, which illustrate AMD's infringement of claim 1 of the '271 Patent.

**Claim 1.   A method of controlling a functional unit of a target processor, the method comprising: [a] using a static code profiler operating on a developer processor and while generating a machine executable instruction from software code, determining whether a functional unit type will be used to perform a process of the machine executable instruction;**

84.     AMD provides static code profilers, which generate machine executable instructions from source code. Examples include AMD's ROCProfiler and Radeon GPU Profiler, which support a wide variety of software operating systems and AMD architectures, including Radeon RDNA.



With AMD's profiling tools, developers are able to gain important insight into how efficiently their application is utilizing hardware and effectively diagnose potential bottlenecks contributing to poor performance. Developers targeting AMD GPUs have multiple tools available depending on their specific profiling needs. This post serves as an introduction to the various profiling tools offered by AMD and why a developer might leverage one over the other. This post covers everything from low level profiling tools to extensive profiling suites.

In this introductory blog, we briefly describe the following tools that can aid in application analysis:

1. ROC-profiler
2. Omniperf
3. Omnitrace
4. Radeon™ GPU Profiler
5. AMD uProf
6. Other Third Party Tools

**Fig. 271-1.** (available at https://rocm.blogs.amd.com/software-tools-optimization/profilers /README .html)

| AMD Profiling Tools | AMD "Zen" Core | RDNA™ | CDNA™ | Windows | Linux® |
|---|---|---|---|---|---|
| ROC-profiler | Not supported | ☆ | ★ | Not supported | ★ |
| Omniperf | Not supported | Not supported | ★ | Not supported | ★ |
| Omnitrace | ★ | ☆ | ★ | Not supported | ★ |
| Radeon™ GPU Profiler | Not supported | ★ | ☆ | ★ | ☆ |
| AMD uProf | ★ | Not supported | ☆ | ★ | ☆ |
| ★ Full support \| ☆ Partial support | | | | | |
| Table 1: Profiler/architecture support and operating system needs. | | | | | |

**Fig. 271-2.** (available at https://rocm.blogs.amd.com/software-tools-optimization/profilers /README .html)

85.     The Radeon GPU Profiler works on "target" GPU processors and provides developers with detailed information about how software applications perform on the target AMD processors, like those using the Radeon GPU architecture. *See* **Fig. 271-1**. That information includes the type of workload, which indicates the type of functional unit needed to execute that workload.

- **Workload views:** Provide different ways to view the same data:

  - **Command buffers:** Shows a list of all command buffers in a submission. Disabling this will condense all command buffers into a single submission block which also specifies the number of contained command buffers.

  - **Sync objects**: Toggles whether to display signals and waits.

  - **Sequential**: An alternate view which shows data linearly as opposed to stacked. The dark right-most portion of command buffers and submits indicates execution time on the GPU.

  - **GPU only**: A flat view of the data which represents solely GPU work. This helps visualize parallelism among all GPU queues.

  - **CPU submission markers:** Draw vertical lines to help visualize when the CPU issued certain types of workloads to the GPU.

  - **Zoom controls:** Consistent with the rest of the tool, these allow users to drill down into points of interest. More information can be found under the Zoom Controls section.

**Fig. 271-3** (available at https://gpuopen.com/manuals/rgp_manual/overview_windows/).

**Claim 1 [b]: Updating a specific needs profile of the process of the machine executable instruction in accordance with the output of the static code profiler, wherein operation of the functional unit having the functional unit type is based on the configuration of the specific needs profile;**

86.    The Radeon GPU Profiler and other profilers include profiles of the specific needs for a given software application. *See, e.g.,* **Fig. 271-1**.



Radeon™ GPU Profiler

The Radeon™ GPU Profiler is a performance tool that can be used by traditional gaming and visualization developers to optimize DirectX 12 (DX12) and Vulkan™ for AMD RDNA™ hardware. The Radeon™ GPU Profiler (RGP) is a ground-breaking low-level optimization tool from AMD. It provides detailed timing information on Radeon™ Graphics using custom, built-in, hardware thread-tracing, allowing the developer deep inspection of GPU workloads. This unique tool generates easy to understand visualizations of how your DX12 and Vulkan™ games interact with the GPU at the hardware level. Profiling a game is both a quick and simple process using the Radeon™ Developer Panel together with the public display driver.

**Fig. 271-4** (available at https://rocm.blogs.amd.com/software-tools-optimization/profilers /README .html).

87.    The information from static profiling can then be mapped, for example, to the RSMU PGFSM Register.

```
+//This is aligned with RSMU PGFSM Register Mapping
+typedef enum {
+  PG_DYNAMIC_MODE = 0,
+  PG_STATIC_MODE,
+} PowerGatingMode_e;
```

**Fig. 271-5** (available at https://lore.kernel.org/all/20190617192704.18038-43-alexander.deucher@amd.com/).



**Fig. 271-6** (available at https://rocm.docs.amd.com/projects/rocprofiler/en/latest/how-to/using-rocprof.html).

**Claim 1 [c]:  storing the specific needs profile in a configuration register and in a lookup-table that comprises a plurality of additional specific needs profiles for a corresponding set of additional processes;** [and]

**Claim 1 [d]:  retrieving the specific needs profile that corresponds to the process to be performed by the target processor from the lookup-table; and**

**Claim 1 [e]:  wherein the specific needs profile is accessed during each context switch of the operating system.**

88.    As noted above, the specific needs profile is stored, first in a temporary directory and then in a directory or register specified by the user, such as the RSMU PGFSM Register. *See* **Fig. 271-5, 271-6**. In use, processors run far more than a single process, so each process will have its own specific needs profile stored for lookup during execution. And once the specific needs profiles are stored in a configuration register and lookup table, they must be retrieved and accessed during execution of a given process. When a processor moves from one discrete process (with a specific needs profile) to another, that is called a context switch. Since each discrete process will have different needs, the corresponding specific needs profile must be retrieved each time there is a context switch.

89.    **Indirect Infringement.** In addition, AMD, without authorization or license from Vampire Labs, is indirectly infringing at least claim 1 of the '271 Patent, including actively inducing

infringement of the '271 Patent under 35 U.S.C. § 271(b).  Such inducements include without limitation, with specific intent to encourage the infringement, knowingly inducing consumers to use infringing articles and methods that AMD knows or should know infringe one or more claims of the '271 Patent.  AMD instructs its customers to make and use the patented inventions of the '048 Patent by operating AMD's products in accordance with AMD's design and specifications.  AMD specifically intends its customers to infringe by implementing the infringing thread-level fine-grained power gating.

90.    In addition, AMD, without authorization or license from Vampire Labs, is indirectly infringing at least claim 1 of the '271 Patent by contributing to its infringement under 35 U.S.C. § 271(c) and/or §271(f), either literally and/or under the doctrine of equivalents. AMD's contributory infringement includes without limitation, AMD's sales and offers to sell a component of a product or apparatus for use in a process, that (i) is material to practicing the invention claimed by claim 1 of the '271 Patent; (ii) is not a staple article or commodity of commerce suitable for substantial non-infringing use; and (iii) AMD is aware or knows to be especially made or especially adapted for use in infringement of the '271 Patent. AMD specifically intends its customers to infringe by implementing fine grained power gating in an infringing manner, as set forth above and in the excerpts from Defendants' technical manuals, source code, controllers, switches, firmware and compilers.

91.    As a result of AMD's infringement of the '271 Patent, Vampire Labs has suffered damages, and is entitled to an award of damages adequate to compensate it for such infringement under 35 U.S.C. § 284, but in no event less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## V.    NOTICE, WILLFUL INFRINGEMENT, AND IRREPARABLE HARM

92.    AMD has received actual notice of the Patents-in-Suit and its infringement at least since the filing of this Complaint, and actual and/or constructive notice before the filing of this

Complaint. If it did not have actual knowledge of infringement prior to filing, it has acted with willful blindness to its infringement.

93.    In connection with its own prosecution activities, including U.S. Patent Publication US20170168546A1, AMD was apprised of the Patents-in-Suit, at least with regard to U.S. Patent No. 9,098,271.

| | | | | | | |
|---|---|---|---|---|---|---|
| **Notice of References Cited** | | | Application/Control No. 14/963,352 | | Applicant(s)/Patent Under Reexamination MESWANI ET AL. | |
| | | | Examiner AUREL PRIFTI | | Art Unit 2116 | Page 1 of 1 |

**U.S. PATENT DOCUMENTS**

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Name | CPC Classification | US Classification |
|---|---|---|---|---|---|---|
| * | A | US-9,098,271 B2 | 08-2015 | Eastlack; Jeffrey R. | G06F1/32 | 1/1 |
| * | B | US-2012/0137018 A1 | 05-2012 | Uhlig; Volkmar | G06F11/004 | 709/231 |
| * | C | US-2013/0148614 A1 | 06-2013 | Noh; Min Seok | H04L5/001 | 370/329 |
| * | D | US-2014/0355438 A1 | 12-2014 | GEDIK; BUGRA | H04L12/6418 | 370/235 |
| * | E | US-2008/0307244 A1 | 12-2008 | Bertelsen; Lars Seondergaard | G06F1/3203 | 713/323 |
| * | F | US-2010/0254704 A1 | 10-2010 | AOKI; Yasuhiko | H04B10/40 | 398/45 |

Office Action dated August 24, 2017 (Appendix).

94.    This provided formal legal notice to AMD of the '271 Patent, and by extension all patents in its family, including the Patents-in-Suit.

95.    To the extent AMD nonetheless claims that it lacked knowledge of its infringement, such position could only be the result of a corporate policy of willful blindness.

96.    AMD has nonetheless continued to make, use, sell, offer for sale and/or import infringing products and methods despite knowing—or at least being willfully blind to the fact—that its actions constituted infringement of Vampire Labs' valid patents. AMD's actions in this regard are knowing, reckless, and willful. At the very least,  AMD has taken the foregoing actions despite an objectively high likelihood that its actions constituted infringement of Plaintiff's valid patent rights. This objective risk was either known or so obvious that it should have been known to Defendant. Accordingly, Plaintiff seeks enhanced damages pursuant to 35 U.S.C. § 284 and reasonable attorneys' fees under 35 U.S.C. § 285.

97. AMD's infringing acts and practices have caused and continue to cause irreparable harm to Vampire Labs.

## VI.    JURY DEMAND

98. Vampire Labs demands a trial by jury of all matters to which it is entitled to trial by jury, pursuant to FED. R. CIV. P. 38, the United States Constitution, and/or other applicable law.

## VII.    PRAYER FOR RELIEF

99. WHEREFORE, Plaintiff Vampire Labs prays for the following:

a. Judgment that AMD has infringed and, unless enjoined, will continue to infringe each of the Patents-in-Suit, either literally and/or under the doctrine of equivalents;

b. Judgment that AMD's infringement is willful;

c. An award to Vampire Labs for past and future damages adequate to compensate Vampire Labs for AMD's infringement and its use of the Patents-in-Suit;

d. An award of pre- and post-judgment interest on the damages assessed at the maximum rate allowed by law;

e. An award of costs under 35 U.S.C. § 284;

f. A finding that this case is exceptional under 35 U.S.C. § 285

g. An award of enhanced damages up to three times the amount found or assessed under 35 U.S.C. § 284;

h. An award of Vampire Labs' reasonable attorneys' fees under 35 U.S.C. § 285;

i. An award of supplemental damages to Vampire Labs, including interest, and with an accounting, as needed;

j. An injunction preventing AMD from infringing the Patents-in-Suit, or, if its infringement is not enjoined, an award of ongoing royalties to Vampire Labs for any post-judgment infringement of the Patents-in-Suit; and

k.     Such other and further relief, both at law and in equity, as the Court deems just and

proper.

Dated: November 14, 2025

Respectfully submitted,

/s/ Scott L. Cole
Scott L. Cole
Texas State Bar No. 00790481
**REICHMAN JORGENSEN LEHMAN & FELDBERG LLP**
515 Congress Avenue
Telephone: (737) 227-3102
scole@reichmanjorgensen.com

/s/ Andrew G. DiNovo
Andrew G. DiNovo
Texas State Bar No. 00790594
Daniel L. Schmid
Texas State Bar No. 24093118
Austin, Texas 78701
**DiNovo Price LLP**
7000 N. MoPac Expressway, Suite 350
Austin, Texas 78731
Telephone: (512) 539-2626
Telecopier: (512) 727-6691
adinovo@dinovoprice.com

ATTORNEYS FOR PLAINTIFF
VAMPIRE LABS, LLC